UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

KENNETH J. BIALOSZYNSKI,
DAVID J. KONKEL, and
THOMAS LOSINEICKI,
on behalf of themselves and others
similarly situated,

                Plaintiffs,

        v.                                  Case No. 03-C-1432

MILWAUKEE FORGE, and
MILWAUKEE FORGE EMPLOYEE
WELFARE BENEFIT PLAN,

                Defendant.

_____

## ORDER

The plaintiffs are retired employees of defendant Milwaukee Forge who represent a class of employees that retired from Milwaukee Forge before September 1, 2003. On September 1, 2003, Milwaukee Forge eliminated retiree health-care benefits. The plaintiffs filed suit, contending that their health benefits were vested and that the termination of their benefits violates Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and Sections 502(a)(1)(B) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3). The parties have filed cross-motions for summary judgment. The plaintiffs contend that collective bargaining agreements ("CBAs") negotiated between Milwaukee Forge and Local 3205 of the United Steelworkers of America, AFL-CIO-CLC ("Union")

unambiguously create an entitlement to health-care benefits that survives the expiration of the CBAs. The defendants deny that any of the CBAs created vested retiree health-care benefits. For the reasons stated below, the court must deny both the defendants' motion for summary judgment and the plaintiffs' motion for summary judgment.

## BACKGROUND

I.     CBAs

None of the CBAs between Milwaukee Forge and the Union prior to 1974 provided any health-care benefits for retirees. The 1974 CBA provided benefits to those who retired from Milwaukee Forge with at least 30 years of service ("30 and out retirees"):

> Effective September 1, 1974, all employees who retire under the "30 and out" provisions of the Pension Plan will be carried on Company Blue Cross, Blue Shield and Major Medical coverage until the age of eligibility for Medicare.

(Defendants' Proposed Findings of Fact ("DPFOF") ¶ 8.) In subsequent CBAs, the type of coverage changed a few times. The 1983 CBA provided that 30 and out retirees would receive "benefits at least equivalent to Blue Cross Series 2000, Blue Shield SM-100, and $50,000 Major Medical Coverage . . . or an HMO whichever is elected." (DPFOF ¶ 15.) The 1998 CBA substituted the Milwaukee Forge Health Insurance Plan dated 9-1-98 for the Blue Cross Blue Shield plans. (DPFOF ¶ 20.) In an agreement between the Union and Milwaukee Forge that was negotiated during the term of the 1998 CBA and took effect on March 1, 2000, Great West Life and Family Health Plan was substituted for the Milwaukee Forge Health Insurance

- 2 -

Plan. (DPFOF ¶ 22.) Although the coverage changed a few times, every CBA from 1974 until September 1, 2003, stated that the 30 and out retiree and spouse would receive health-care benefits "only until each respectively reaches the age of eligibility for Medicare."[1]

Beginning in 1977, Milwaukee Forge agreed to provide health-care benefits for additional categories of retirees other than the 30 and out retirees. The 1977 CBA allowed an employee who retired between the ages of 50-62 to continue coverage for himself, his spouse, and his legally dependent children "provided the employee himself continues to pay the premiums for such coverage." (DPFOF ¶ 10.) For employees who retire between the ages of 62-65, the 1977 CBA stated that Milwaukee Forge would pay the premiums for coverage for the employee and the employee's spouse "until each respectively becomes eligible for Medicare." (*Id.*) Aside from the substitutions of coverage previously mentioned, every CBA in effect from 1977 through August 31, 2003, contained the same provisions.

The 1998 CBA differed from previous CBAs in at least two respects. First, the 1998 CBA was effective from September 1, 1998 until and including August 31, 2003, a duration that exceeded the three-year term of every prior CBA since at least 1974. Second, the 1998 CBA contained the following statement that no prior CBA contained:

---

[1]The defendants attach only a portion of the 1974 CBA to the Affidavit of Patrick Danno. (*See* Danno Aff. Ex. 1, March 7, 2005.) Therefore, the court is unable to determine whether the 1974 CBA provided coverage for the spouses of 30 and out retirees. The text of the 1992, 1995, and 1998 CBAs, however, all refer to "30 and Out Retiree and Spouse."

> The Company will provide group health insurance as designated in the Milwaukee Forge Health Insurance Plan dated 9-1-98. The Company will also provide one HMO type insurance. Although the Company provides insurance policies for employees under this contract the specific insurance carriers providing those policies determine benefit levels and coverages during the term of the contract. Insurance policies are incorporated into this contract by reference and are controlling as to disputes involving claimed benefits.

(Breihan Aff. Ex. 3 at 66, March 8, 2005.)[2]

## II.     2003 CBA

Due to its continuing financial problems, Milwaukee Forge sought to eliminate retiree insurance benefits in the 2003 CBA. (DPFOF ¶ 29.) On June 25, 2003, Milwaukee Forge presented to the Union a contract proposal that would eliminate retiree health care but stated that Milwaukee Forge would contribute 25% toward COBRA insurance premiums for six months for employees retiring after September 1, 2003, with at least 30 years of service. (DPFOF ¶ 37.) During the negotiating process, the Union addressed a March 17, 2003 letter to retirees and their spouses, stating that it would "fight to the end if necessary to protect the retirees and their families." (DPFOF ¶ 34.) During a two-day negotiation session on August 18-19, 2003, Union President Chris Knaskinski told Milwaukee Forge's President that the retirees were asking the Union to strike rather than agree to the elimination of retiree health-care benefits. (DPFOF ¶ 42.) On August 21, 2003, Union President Knaskinski stated that Milwaukee Forge should not eliminate the retirees' health-care benefits. (DPFOF ¶ 44.) On August 28, 2003, Milwaukee

---

[2]Pages 68-71 are missing from this exhibit, but they can be found in Exhibit 7 of the March 7, 2005 Affidavit of Patrick Danno.

Forge made its final proposal to the Union which eliminated all insurance benefits retiring after 9-1-03 that elect COBRA, the company will contribute 25% of the COBRA premium for the first six months of retirement." (DPFOF ¶ 46.) On August 28, 2003, members of the Union voted to accept Milwaukee Forge's final offer. (DPFOF ¶ 51.) Retired employees are not afforded the right to vote on contract ratifications, and they did not vote at the August 28, 2003 Union meeting. (PLS.' Resp. to DPFOF ¶¶ 47, 51.) During the 2003 negotiations, the Union was not authorized by the retirees in writing or by any vote of the retirees to represent them in negotiations. (PLS.' Proposed Findings of Fact in Opp'n to Summ. J. ¶ 2.) On September 2, 2003, Milwaukee Forge issued a letter to retirees that stated:

> Due to the rising costs of health care in Wisconsin and economic circumstances beyond our control, Milwaukee Forge is no longer in a position to provide health care benefits to its retirees and their dependents. As a result health care benefits will cease effective November 30, 2003, the first date on which retirees and their dependents will not have coverage is December 1, 2003. The Company regrets that economic circumstances have forced us to make this change.

(DPFOF ¶ 54.)

III.    The Class

The plaintiffs represent a class of former employees of Milwaukee Forge who retired before September 1, 2003, as well as spouses and dependents who were receiving health-care coverage under the Milwaukee Forge Employee Welfare Benefit Plan as of August 31, 2003.[3] The class consists of 64 individuals, (*see*

---

[3]The plaintiff class is defined as follows:

Former members of United Steelworkers Local 3205 who retired from Milwaukee Forge

Joint Pet. for Class Certification 4), however, it is unclear how many of these individuals are 30 and out retirees or their spouses, former employees who retired between the ages of 50-62 (and their spouses and dependents), or former employees who retired between the ages of 62-65 (and their spouses). One of the class members is the spouse of a deceased retiree who retired during the term of the 1992 CBA, September 1, 1992 to August 31, 1995.[4] (PLS.' Proposed Findings of Fact ("PPFOF") ¶ 10.) The remainder of the class members retired during the term of the 1995 CBA, September 1, 1995 to August 31, 1998, or the 1998 CBA, September 1, 1998 to August 31, 2003.[5] (PPFOF ¶¶ 8-9.)

IV.    Insurance policies

Apart from the CBAs themselves, the defendants point to clauses within several of the insurance policies and summary plan descriptions ("SPD") that purportedly reserve the right to change or terminate the health-care benefit plans ("reservation of rights" clauses). The Wausau Group Health PPO Insurance

---

prior to September 1, 2003 while working under the terms of a collective bargaining agreement between Milwaukee Forge and United Steelworkers Local 3205 ("Steelworker Retirees"), together with spouses and dependents of those Steelworker Retirees, who were participants in and receiving health coverage under the Milwaukee Forge Employee Welfare Benefit Plan as of August 31, 2003, but had their coverage discontinued, subject only to COBRA continuation rights, effective September 1, 2003.

(Joint Pet. for Class Certification 1.)

[4]The plaintiffs do not indicate the age of the deceased spouse at the time that he retired.

[5]The class members who retired during the term of the 1998 CBA appear to include persons who retired before and after the March 1, 2000 agreement substituted Great West Life and Family Health Plan for the Milwaukee Forge Health Insurance Plan. (PPFOF ¶ 8.)

- 6 -

Company Plan that was in effect from November 1, 1995-November 1, 1998, stated:

> This Plan may be changed at any time by written agreement between the Plan Holder [Milwaukee Forge] and Us, without the consent of the insured employees.

(DPFOF ¶ 58.) The SPD for the Wausau Preferred Health Plan (1996) and the SPD for the Wausau Preferred Health Plan that was in effect from November 1, 1998-February 28, 2000, both stated:

> The right is reserved for the plan administrator to terminate, suspend, withdraw, amend, or modify the plan in whole or in part at any time, subject to the applicable provisions of the policy, the practices of the insurer and the terms of any applicable collective bargaining agreement.

(DPFOF ¶¶ 59, 61.) The Wausau Group Health Insurance Policy, dated January 1999, stated:

> This Plan will continue for as long as premiums are paid or until it is canceled. Notice to cancel the Plan can come from either the Plan Holder [Milwaukee Forge] or from Us. The Plan Holder may cancel any or all of the insurance by giving Us written notice.

(DPFOF ¶ 60.) The Services Contract that Milwaukee Forge had with Great-West, entered into on March 1, 2000, stated:

> This contract may be terminated by the contract holder by providing 31 days' written advance notice.

(DPFOF ¶ 62.) The Milwaukee Forge PPO/POS SPD, dated March 1, 2000, stated:

> Your coverage will end on the earliest of the following dates: The date the employer terminates the benefits described in this booklet.

(DPFOF ¶ 63.)  The Milwaukee Forge Employee Welfare Benefit Plan, dated December 18, 2002, stated:

> Subject to any restrictions in any applicable collective bargaining agreements, the employer shall have the sole right to alter, amend or terminate this Plan and any Program, in whole or in part, at any time it determines to be appropriate, without notice and without the consent of any Participant, any Participant's spouse, dependents or beneficiary or any other person.

(DPFOF ¶ 64.)  The SPDs for the Milwaukee Forge Steelworkers POS I Plan and for the PPO Plan, both dated March 1, 2003, stated:

> The employer may: . . . amend or terminate the benefits provided to you in the Plan.

(DPFOF ¶ 65.)  Neither the plaintiffs nor the defendants inform the court how many class members received benefits under each of the policies identified by the defendants or how many other health insurance policies were offered to the retirees.

V.      Procedural History

The plaintiffs filed suit on December 11, 2003.  The defendants filed an answer on February 26, 2004.  The court signed a scheduling order on June 14, 2004, which stated that the plaintiffs would submit a petition for class certification by July 30, 2004, and that the deadline for submission of summary judgment motions shall be 150 days after the court's ruling on the petition for class certification.  The parties filed a joint motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) on July 29, 2004. The plaintiffs also filed an unopposed motion for leave to file an amended complaint.  The court granted

the motions on October 5, 2004, but filed the order on October 8, 2004. The plaintiffs calculated the deadline for summary judgment based upon the October 5, 2004 date, filing their motion for summary judgment on March 4, 2005. The defendants calculated the deadline based upon the October 8, 2004 date, filing their motion for summary judgment on March 7, 2005. On March 8, 2005, the plaintiffs moved to strike the defendants' motion for summary as untimely in light of the court's scheduling order. The motions for summary judgment are fully briefed.

## ANALYSIS

I.     Plaintiffs' motion to strike

The summary judgment deadline should have been calculated from the date that the court granted the petition for class certification, not from the date that the order was filed. Although a litigant's inattentiveness or disregard of a scheduling order can become so serious that a sanction is warranted, *see Easley v. Kirmsee*, 382 F.3d 693, 698 (7th Cir. 2004), the court does not believe that a sanction is warranted in this case. The court often files its order on the date that the order is signed, so the court can excuse the defendants' error. The court has no basis to conclude that the defendants intentionally disregarded the court's scheduling order. The defendants' motion for summary judgment was only three days late. The court accepts the defendants' motion for summary judgment as if it were timely filed. Accordingly, the plaintiffs' motion to strike will be denied.

II.    Summary judgment motions

Summary judgment is appropriate where the movant establishes that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a material fact is "genuine" if a reasonable finder of fact could find in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 256-57. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). Any doubt as to the existence of a material fact is to be resolved against the moving party. *Anderson*, 477 U.S. at 255 (1986).

Unlike pension benefits, ERISA does not require the vesting of health-care benefits. *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). "[I]f they vest at all, they do so under the terms of a particular contract." *Pabst Brewing Co. v. Corrao,* 161 F.3d 434, 439 (7th Cir. 1998). If a CBA or other governing document provides for health-care benefits for retirees, but is silent on the issue of whether or not those benefits exceed the life of the agreement, then the presumption is that the benefits expire with the agreement. *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 606-08 (7th Cir. 1993) (en banc). To rebut the

presumption that all contractual obligations cease upon the expiration of the contract, the contract need not use the word "vest" or state unequivocally that it is creating rights that will not expire when the contract expires. *Bidlack*, 993 F.3d 607. Rather, the contract may contain language that suggests that the benefits do not expire with the agreement, such as a clause that specifies the duration of the benefits. *See, e.g., Bland*, 401 F.3d at 785-87 (holding that "lifetime" benefits language, in the absence of a reservation of rights clause, creates ambiguity as to vesting); *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 637 (7th Cir. 2004) ("[T]he grant of 'lifetime' benefits would have created an ambiguity allowing [the plaintiffs] a trial and allowing us to examine extrinsic evidence of the parties' intent.). *But see Senn v. United Dominion Industries, Inc.*, 951 F.2d 806, 810, 815 (7th Cir. 1992) (language that the company "will continue" to pay premiums does not create an ambiguity as to vesting). If such an ambiguity is not disambiguated elsewhere in the contract, then the plaintiff is entitled to a trial and the court may consider evidence of the parties' intent that is extrinsic to the written documents. *Rossetto v. Pabst Brewing Co.,* 217 F.3d 539, 547 (7th Cir. 2000). If, however, the agreement makes clear that the entitlement expires with the agreement (e.g. the agreement states that the benefits shall be provided "during the term of this agreement" or "unless the collective bargaining agreement has expired"), the employee's entitlement expires with the agreement. *Id.* On the other hand, if the agreement unambiguously provides that the benefits vest, the plaintiff is entitled to a judgment in his favor. *Id.*

The question is essentially one of contract interpretation and federal principles of contract construction apply. *Bland*, 401 F.3d at 783; *Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305 (7th Cir. 1996). The court will give contract terms their "ordinary and popular" sense and avoid resort to extrinsic evidence when faced with unambiguous language. *Diehl*, 102 F.3d at 305. The court will interpret potentially conflicting provisions within the same document, or within a single contract formed of several documents, in a manner that reconciles those provisions because a contract should be read as a whole with all its parts given effect. *Diehl*, 102 F.3d at 307; *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 565 (7th Cir. 1995).

The 1992, 1995, and 1998 CBAs all state that a 30 and out retiree and spouse will continue to receive health insurance "only until each respectively reaches the age of eligibility for Medicare." The 1992, 1995, and 1998 CBAs all state that Milwaukee Forge will pay health insurance premiums for an employee who retires between age 62 to Medicare and for his spouse at the time of retirement "until each respectively becomes eligible for Medicare." These clauses suggest that the health-care benefits extend beyond the terms of the CBAs. In the absences of a reservation of rights clause or a clause that expressly states that benefits shall be provided only "during the term of this agreement," clauses that specify the duration of benefits–e.g. benefits will continue until age 65 or for the life of the retiree–create an ambiguity as to whether those benefits are vested. *See Bland*, 401 F.3d at 785-87 (holding that "lifetime" benefits language, in the absence

- 12 -

of a reservation of rights clause, creates ambiguity as to vesting); *Vallone*, 375 F.3d at 637 ("[T]he grant of 'lifetime' benefits would have created an ambiguity allowing [the plaintiffs] a trial and allowing us to examine extrinsic evidence of the parties' intent.); *Bidlack*, 993 F.2d at 608 ("But the agreements are not silent on the issue; they are merely vague. They say that once retired employees reach the age of 65 the company will pick up the full tab for their health insurance and that when they die their spouses will continue to receive supplemental health benefits, again at the company's cost. This could be thought a promise to retired employees that they and their spouses will be covered for the rest of their lives."). The ambiguity in the CBAs in this case is the same type of ambiguity identified in *Bidlack*. Just as the CBA in *Bidlack* did not say that benefits would last "until the retiree dies or the collective bargaining agreement expires, whichever occurs first," *see* 993 F.2d at 608, the CBAs in this case do not say that benefits will continue "only until the age of Medicare eligibility or the collective bargaining agreement expires, whichever occurs first," but simply until they reach the age of Medicare eligibility. 993 F.2d at 608.

Focusing exclusively on the provision that 30 and out retirees and spouses will continue to receive health insurance until each respectively reaches the age of eligibility for Medicare, the plaintiffs argue that the clause does not merely create an ambiguity regarding vesting but unambiguously provides for vesting. Consequently, the plaintiffs argue that they are entitled to judgment, not trial. Although *Diehl* intimates that "lifetime" language may unambiguously provide for

vesting, *Bland*, 401 F.3d at 786, the more common view is that durational language creates an ambiguity as to vesting. *See id.* at 786-87 (holding that "lifetime" language uncontradicted by the agreement read in its entirety defeats summary judgment and entitles the plaintiff to a trial); *Bidlack*, 993 F.2d at 608-09 (discussing why the durational clause renders the contract ambiguous and does not inevitably lead to judgment for the plaintiffs); *see also Vallone*, 375 F.3d at 637 ("[T]he grant of 'lifetime' benefits would have created an ambiguity allowing [the plaintiffs] a trial and allowing us to examine extrinsic evidence of the parties' intent.). If the CBAs expressly state that the benefits survive the expiration of the CBAs or otherwise expressly indicate that the benefits are vested, the plaintiffs may be entitled to judgment rather than trial, providing that the statements are not somehow negated by the agreement read as a whole. *Rossetto*, 217 F.3d at 547 ("Of course, if the agreement expressly grants such benefits, the plaintiff is entitled, not to a trial, but to a judgment."). The CBAs do not contain any such express statements. Because the durational clause in the CBAs do not entitle the plaintiffs to judgment, the court denies their motion for summary judgment.

Although the parties do not differentiate between the types of retirees within the plaintiff class, the 30 and out retirees and spouses and the retirees age 62 to Medicare and spouses are the only groups of plaintiffs who may be entitled to a trial. The record before the court does not indicate how many, if any, plaintiffs of the 64-member class are legally dependent children of the retirees or early retirees age 50-62. With respect to the dependent children, the CBAs do not state that the

children will receive health benefits for any duration of time beyond the expiration of the CBAs. Because the CBAs are completely silent on the duration of health benefits, the entitlement to them expires with the agreements. *Rossetto*, 217 F.3d at 547 (describing the *Bidlack* presumption); *Bidlack*, 993 F.2d at 608. With respect to the early retirees age 50-62, the CBAs state that the retiree pays the premiums for insurance coverage. The CBAs do not contain a provision that the early retirees will receive health benefits until they reach the age of eligibility for Medicare and, therefore, do not create an ambiguity as to vesting. *Id.*

For the 30 and out retirees and the retirees age 62-65, even though the CBAs state that they will receive benefits until the age of 65, the ambiguity created by such a clause may be "negated by the agreement read as a whole." *Rossetto*, 217 F.3d at 547. The CBAs themselves do not contain any qualification that makes clear that the entitlement expires with the agreement, such as a clause that states, "unless the collective bargaining agreement has expired" or "during the term of this agreement." *See Corrao*, 161 F.3d at 441 (holding that "for the term of this Agreement" unambiguously demonstrated that the health benefits did not vest). Neither do the CBAs contain a clause that reserves Milwaukee Forge's right to amend or terminate the health benefits. *See UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 703 (7th Cir. 2003) (holding that lifetime health benefits are not vested if they are granted by the same contract that reserves the right to change or terminate benefits).

The defendants argue that the reservation of rights clauses in various insurance policies and SPDs allow Milwaukee Forge to amend or terminate health benefits. The defendants, however, have not provided this court with enough information or analysis to conclude that these documents are part of the same contract as the CBAs. In a clipped fashion, the defendants argue, "the CBA must be read in conjunction with the plan and the SPD." (Defs.' Br. Summ. J. 19.)[6] What particular CBA, plan, and SPD do the defendants mean? Each CBA is a separate contract. The defendants have excerpted language from no less than eight separate insurance documents, (*see* DPFOF ¶¶ 58-65), without attempting to explain (1) which documents should be read together with which CBA, or (2) why any of the insurance documents should be read together with any of the CBAs at all. *Compare Diehl*, 102 F.3d at 306-07 (determining that a Shutdown Agreement was independent of an insurance agreement because it was supported by separate consideration and not executed in close temporal proximity to the insurance agreement), *and Bidlack*, 993 F.2d at 606 (rejecting a reservation of rights clause in a contract between an employer and insurance company for the purchase of health insurance because "the union was not a party to the insurance contract between the [employer] and its insurer, and anyway the issue is not the obligations

---

[6]The defendants cite *Murphy*, 61 F.3d at 567, and *Ryan v. Chromalloy American Corp.*, 877 F.2d 598, 604 (7th Cir. 1989). (Defs.' Br. Summ. J. 19; Defs.' Reply Br. 5-6.) Although the defendants argue that it is "black letter law that the collective bargaining agreement must be read in conjunction with the Plan and the SPD," (Defs.' Reply Br. 5-6), the cases cited in the body of this order demonstrate that not every CBA is part of the same contract as every insurance document. *See Diehl*, 102 F.3d at 305 ("Of course, we cannot interpret "the contract," until we identify the contract that we would interpret.").

- 16 -

of [the insurance company] to [the employer] but [the employer's] obligations to its retired employees. Those obligations are defined by the collective bargaining agreements, not by the insurance contract."), *with Vallone*, 375 F.3d at 634-37 (holding that a reservation of rights clause in a general retirement plan is an "integral part" of an early retirement package that provides a lifetime benefit because the nature of the lifetime benefit was created by the general retirement plan, the early retirement package was not separate and distinct from the general retirement plan, and the early retirement package incorporated a guide that included a reservation of rights clause), *Rockford Powertrain*, 350 F.3d at 701-05 (distinguishing *Diehl* on the basis that the CBA at issue "contains no statement regarding the period of time during which retirees would be entitled to benefits; thus, there is no conflict between the terms of the CBA and the terms of insurance provided in the plan description" and finding that the plaintiffs conceded that an insurance plan description that contained a reservation of rights clause was negotiated and incorporated into the CBA), *and Murphy*, 61 F.3d at 567 (finding that "the terms of the CBA and the Plan were negotiated and executed, and therefore must be read together" and "both the Plan and the CBA rest on the same consideration: the mutual promises set forth in the CBA").

The defendants argue that the 1998 CBA expressly incorporates the terms of "the Plan." (Defs.' Br. Summ. J. 19.) The 1998 CBA states:

> The Company will provide group health insurance as designated in the Milwaukee Forge Health Insurance Plan dated 9-1-98. The Company will also provide one HMO type insurance. Although the Company provides insurance policies for employees under this contract the

> specific insurance carriers providing those policies determine benefit levels and coverages during the term of the contract. Insurance policies are incorporated into this contract by reference and are controlling as to disputes involving claimed benefits.

(Breihan Aff. Ex. 3 at 66, March 8, 2005.) The only insurance policy that the 1998 CBA specifically references is "the Milwaukee Forge Health Insurance Plan dated 9-1-98"; the 1998 CBA also generally refers to "one HMO type insurance." However, none of the eight insurance documents that the defendants reference is described as "the Milwaukee Forge Health Insurance Plan dated 9-1-98." (*See* DPFOF ¶¶ 58-65.) Moreover, the defendants do not identify the "one HMO type insurance" referenced generally in the 1998 CBA. The defendants do not explain whether any of the eight insurance documents were negotiated and executed alongside the 1998 CBA or whether they share the same consideration as the 1998 CBA. *See Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 713 n.13 (7th Cir. 1985) ("Although the franchise agreement is evidenced by five separate documents, they were executed at the same time between the same parties, for the same purpose and as parts of a single transaction, and so are to be read together and construed as a single contract."). At a minimum, the defendants' failure to identify a reservation of rights clause within the "Milwaukee Forge Health Insurance Plan dated 9-1-98" suggests that at least a portion of the retirees in the plaintiff class may have received benefits under an insurance policy that did not contain a reservation of rights clause. Neither the plaintiffs nor the defendants inform the court how many class members received benefits under each of the policies identified by the defendants or how many other health insurance policies were

offered to the retirees. The defendants may yet be entitled to judgment, but because the record is incomplete, the court is obliged to deny the defendants' motion for summary judgment.

At most, however, the defendants would only be entitled to partial summary judgment. Even if the Milwaukee Forge Health Insurance Plan dated 9-1-98 contained a reservation of rights clause that entitled the defendants to summary judgment,[7] the defendants would not be entitled to summary judgment with respect to the members of the plaintiff class who retired under the 1992 and 1995 CBAs. The 1992 and 1995 CBAs state that the retirees would receive benefits "at least equivalent to Blue Cross Series 2000, Blue Shield SM-100, and $50,000 Major Medical . . . or an HMO whichever is elected." The defendants have not argued that the Blue Cross Blue Shield insurance policies contained a reservation of rights clause, and none of the eight insurance documents referenced by the defendants existed during the term of the 1992 CBA.

The defendants raise other arguments in their motion for summary judgment that are unavailing. The defendants argue that the plaintiffs may not recover for any breach of the 1992, 1995, or 1998 CBAs because the CBAs expired. "Sometimes, however, a contract creates entitlements that outlast it," *Bidlack*, 993 F.2d at 606; in this case, the finder of fact may determine that the CBAs created vested retiree health-care benefits. The defendants also argue that the

---

[7]Although the parties do not devote any analysis to the language of the various reservation of rights clauses identified by the defendants, not all reservation of rights clauses are themselves devoid of ambiguity. *See Diehl*, 102 F.3d at 308.

Case 2:03-cv-01432-JPS   Filed 03/06/06   Page 19 of 21   Document 63

retirees are "bound by" the 2003 CBA that eliminated their benefits because they authorized and consented to have the Union negotiate on their behalf during the negotiations leading to the 2003 CBA. The defendants spill a lot of ink on this argument but cite to only one case, *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971), that states:

> This does not mean that when a union bargains for retirees–which nothing in this opinion precludes if the employer agrees–the retirees are without protection. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent.

*Id.* at 182 n.20. In this case, the retirees did not consent to relinquish vested benefits and did not authorize the Union to relinquish their rights. The fact that some retirees may have exhorted Milwaukee Forge to continue providing retiree health benefits, or had the Union exhort Milwaukee Forge on their behalf, does not mean that they forfeited their statutory claims or any vested benefits.

According to the scheduling order, the parties have agreed to conduct further discovery on damage issues following this decision. The court encourages the parties to reevaluate their respective positions in light of this order and the authorities identified herein; in doing so, the parties may reach an accommodation or otherwise agree on the scope of the plaintiffs' claims that are appropriate for trial. If not, the court will hear counsel for the parties at the final pretrial conference to be scheduled when the parties notify the court that the case is ready for trial.

Accordingly,

**IT IS ORDERED** that the defendants' motion for summary judgment be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiffs' motion for summary judgment be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that the plaintiffs' motion to strike be and the same is hereby **DENIED**.

Dated at Milwaukee, Wisconsin, this _6th_ day of March, 2006.

BY THE COURT:

_s/ J. P. Stadtmueller_____
J. P. Stadtmueller
U.S. District Judge
